# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, on behalf of themselves and all others similarly situated, | Case No.: 19cv2900 |
| Plaintiff, | |
| v. | |
| BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS SECURITIES CORP.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE AG; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; FIRST TENNESSEE BANK, N.A.; FTN FINANCIAL SECURITIES CORP.; GOLDMAN SACHS & CO. LLC; JEFFERIES GROUP LLC; JPMORGAN CHASE BANK, N.A.; J. P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INC; AND UBS SECURITIES LLC; and UNNAMED CO-CONSPIRATORS; | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Mayor and City Council of Baltimore (the "City of Baltimore"), on behalf of itself and all others similarly situated, by its counsel, asserts claims for violations of federal antitrust law against the Defendants identified below (collectively, "Defendants") arising from the collusion among Defendants to fix the prices of bonds sold to investors from January 1, 2009 through April 27, 2014 (the "Class Period"). The bonds were issued by the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, these bonds are called "FFBs").

1

## INTRODUCTION

1.    The City of Baltimore paid almost **_$1 billion_** for 108 FFBs during the Class Period, and therefore suffered enormous monetary losses when it was overcharged in these transactions, as a direct result of Defendant's price fixing conspiracy.

2.    Defendants are horizontal competitors and the leading dealers of FFBs.  FFBs are unsecured debt securities and do not include the mortgage-backed securities issued by Fannie Mae and Freddie Mac.

3.    Defendants were the biggest purchasers of FFBs issued by Fannie Mae and Freddie Mac during the Class Period.  Defendants therefore had control over the supply of FFBs available to investors on the primary and secondary market.

4.    The United States Department of Justice ("DOJ") has opened a criminal investigation into price manipulation by bank traders in the FFB market.  Several confidential sources, cited in various press reports, have indicated that DOJ investigators are evaluating potential fraud and antitrust violations.

5.    The secondary market for FFBs is an "over-the-counter" ("OTC") market.  In other words, the FFBs are traded through a network of broker-dealers, rather than on a centralized, formal exchange such as the New York Stock Exchange.  Unlike trading on the stock market, in which price information is publicly available and updated in real-time during trading, investors receive price quotes directly from the dealer when buying or selling FFBs. Therefore, this OTC market is structured to permit a limited set of dealers with exclusive access to price information to coordinate pricing at the expense of investors.

6.    Economic analysis of available price data and market information show that Defendants fixed the prices of FFBs during the Class Period.  As a result, the City of Baltimore

and the Class overpaid when purchasing FFBs and were underpaid when selling FFBs when transacting with Defendants.

7.     The City of Baltimore obtained price data for 2,437 unique FFBs and 140,114 daily FFB observations from Bloomberg.  This data, along with other market information, demonstrates abnormal FFB pricing during the Class Period which is consistent with a scheme by Defendants to fix the prices of the FFBs they traded.

8.     First, that data indicates that Defendants made an agreement to overcharge investors when selling FFBs newly issued by Fannie Mae or Freddie Mac.  Defendants typically made a substantial number of FFB sales during the week following an FFB issuance.  Therefore, after acquiring FFBs from Fannie Mae or Freddie Mac, Defendants possessed a common motive to inflate the prices of these FFBs and to agree upon supracompetitive prices to charge investors.

9.     Second, the data indicates that Defendants agreed to inflate the prices of older FFBs in the days prior to a new FFB issuance.  By inflating the price of existing FFBs, Defendants also caused artificial inflation of the price of new FFBs, allowing Defendants to overcharge investors and therefore earn illegal, excessive profits by selling their newly-acquired FFBs.

10.     Third, the data indicates that during the Class Period, Defendants agreed to sell and purchase FFBs in the secondary market at fixed prices, rather than compete with one another for FFB investor transactions.  Specifically, Defendants sold FFBs at inflated prices (the "ask" price) and purchased FFBs from investors at deflated prices (the "bid" price).  A comparison between the bid-ask spreads charged by Defendants during the Class Period and the bid-ask spreads charged by Defendants after the Class Period illustrates that the bid-ask spreads

noticeably decreased, without any clear economic basis.  Therefore, the data shows that the FFB secondary market during the Class Period was not competitive.

11.     Notably, the data also shows that the above three tactics by Defendants markedly decreased after April 2014.  Around that time, as a result of the LIBOR and Forex scandals, publicity regarding and government oversight of banks' anticompetitive trading and sales conduct increased.[1]

12.     Accordingly, Defendants conspired to fix prices in the secondary FFB market by overcharging investors purchasing Defendants' FFBs and underpaying investors selling their FFBs to Defendants.  Through this conspiracy, Defendants received supracompetitive profits at the expense of the City of Baltimore and Class Members.

13.     This conspiracy injured investors like the City of Baltimore, which were attracted to FFBs because they are generally considered safe, liquid investments.  Instead, these investors were financially harmed by overpaying for FFB purchases and being underpaid by their FFB sales.

14.      Like the LIBOR and Forex scandals, this alleged conspiracy—by some of the same Defendants and during the same time period—is another attempt to collude, fix prices, and restrain trade and competition in financial markets.  Because of the ongoing DOJ investigation into Defendants' misconduct and the systematic, secretive nature of Defendants' conspiracy, the City of Baltimore maintains, on information and belief, that they will obtain further evidence to support their claims after a reasonable opportunity for discovery.

---

[1] The LIBOR scandal refers to a scheme by several banks to manipulate of the London InterBank Offered Rate, which has been the subject of prolonged litigation.  The Forex scandal refers to a scheme by banks to manipulate foreign exchange rates, which has resulted in several investigations and criminal proceedings.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to Section 1 of

the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15

and 26, and 28 U.S.C. § 1331.

16.     Venue is proper in the Southern District of New York pursuant to Sections 4, 12,

and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b)-(d).  During the

Class Period: each Defendant resided, transacted business, was found, or had agents in the

District; a substantial portion of the events or omissions giving rise to the City of Baltimore's

claims occurred in the District; and a substantial portion of the affected interstate trade and

commerce was carried out in the District, as alleged in detail below.

17.     This Court has personal jurisdiction over each Defendant.  All of Defendants were

formed in or have their principal place of business in the United States, and/or are found or

transact business in this District. Therefore this Court has personal jurisdiction under the

nationwide contacts test in 15 U.S.C. § 22.  As alleged more specifically below, each Defendant

had substantial contacts with this District, and a substantial portion of the events giving rise to

the City of Baltimore's claims occurred in this District and in the United States: Defendants

agreed to fix prices of FFBs they traded in this District and with investors located in the United

States.  This anticompetitive conspiracy harmed investors in this District and in the United States

by overcharging them for FFB purchases and underpaying them for FFB sales.

18.     Defendants purposefully availed themselves of entering into FFB transactions in

this District and in the United States, themselves or through their subsidiaries, by: (1) acting in

furtherance of their conspiracy by charging fixed, inflated or deflated prices in FFB transactions

in this District and in the United States; and (2) accepting illegal, excessive payments from investors in this District and in the United States.

## PARTIES

### A.    Plaintiff

19.    Plaintiff is the Mayor and the City Council of Baltimore, a municipal corporation organized and existing under the laws of the State of Maryland.

20.    Throughout the Class Period, the City of Baltimore participated in FFB transactions directly with Defendants Citigroup Global Markets, Inc., UBS Securities LLC, FTN Financial, and Jefferies Group LLC.  The City of Baltimore paid almost $1 billion for 108 FFBs during the Class Period, and therefore suffered monetary losses when it was overcharged in these transactions, as a direct result of Defendant's price fixing conspiracy.

### B.    Defendants[2]

21.    **Bank of America/Merrill Lynch:** Defendant Bank of America, N.A. is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina.  Bank of America, N.A. is an indirect, wholly-owned subsidiary of Bank of America Corporation, a Delaware corporation headquartered in Charlotte, North Carolina.  One of Bank of America, N.A.'s largest branches is located in New York, New York.  At all times during the Class Period, Bank of America, N.A. employed traders in New York who facilitated and executed FFB transactions with the Class.  Bank of America, N.A. directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions,

---

[2] Any reference to any Defendant entity herein includes that entity, its parent companies, subsidiaries, affiliates, predecessors, and successors. Similarly, any reference to any act or transaction of any entity means that the entity engaged in the act or transaction by or through its officers, directors, agents, employees, or representatives.

including by serving as a trading broker.  Bank of America, N.A. purposefully engaged in FFB transactions with Class members at artificial prices.

22.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is incorporated in Delaware and has its principal place of business in New York, New York.  Merrill Lynch is a wholly incorporated indirect subsidiary of Bank of America Corporation.[3]  At all times during the Class Period, Merrill Lynch employed traders in New York who facilitated and executed FFB transactions with the Class.  Merrill Lynch directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker.  Merrill Lynch purposefully engaged in FFB transactions with Class members at artificial prices.

23.     **Barclays:** Defendant Barclays Bank PLC, operating as "Barclays Investment Bank," is headquartered in London, England and maintains at least three offices in the United States through which it provides investment banking advisory services and loan syndication services, including its New York office, located in this District.  Barclays Bank PLC is a direct, wholly owned subsidiary of Barclays PLC, a British public limited company headquartered in London, England.  At all times during the Class Period, Barclays Bank PLC employed traders in New York who facilitated and executed FFB transactions with the Class.  Barclays Bank PLC directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker.  Barclays Bank PLC purposefully engaged in FFB transactions with Class members at artificial prices.

24.     Defendant Barclays Capital Inc. is a wholly owned subsidiary of Barclays Bank PLC.  It is incorporated in Connecticut, with headquarters in New York, New York and branch

---

[3] Bank of America Corporation purchased Merrill Lynch and merged it with Bank of America Corporation's former broker-dealer subsidiary, Banc of America Securities LLC.  Banc of America Securities LLC no longer exists as an entity.

offices in at least 15 other U.S. cities.  At all times during the Class Period, Barclays Capital Inc. employed traders in New York who facilitated and executed FFB transactions with the Class. Barclays Capital Inc. directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker.  Barclays Capital Inc. purposefully engaged in FFB transactions with Class members at artificial prices.

25.    **BNP Paribas:** Defendant BNP Paribas Securities Corp. is a banking organization incorporated in Delaware with its principal place of business in New York, New York.  At all times during the Class Period, BNP Paribas Securities Corp. employed traders in New York who facilitated and executed FFB transactions with the Class.  BNP Securities Corp. directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker.  BNP Securities Corp. purposefully engaged in FFB transactions with Class members at artificial prices.

26.    **Citi**: Defendant Citigroup Global Markets Inc. is incorporated in New York with its principal place of business in New York, New York.  At all times during the Class Period, Citigroup Global Markets Inc. employed traders in New York who facilitated and executed FFB transactions with the Class.  Citigroup Global Markets Inc. directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker.  Citigroup Global Markets Inc. purposefully engaged in FFB transactions with Class members at artificial prices, including with the City of Baltimore.

27.    **Credit Suisse:** Defendant Credit Suisse AG is a Swiss company headquartered in Zurich, Switzerland.   Its primary U.S. office—"Credit Suisse Ag, New York Branch"—is located in New York, New York.  Defendant Credit Suisse Securities (USA) LLC is a wholly owned subsidiary of Credit Suisse.  It is incorporated in Delaware with its principal place of

business in New York, New York.  At all times during the Class Period, Credit Suisse AG and Credit Suisse Securities (USA) LLC (collectively, "Credit Suisse") employed traders in New York who facilitated and executed FFB transactions with the Class.  Credit Suisse directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker.  Credit Suisse purposefully engaged in FFB transactions with Class members at artificial prices.

28.    **Deutsche Bank:** Defendant Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany.  Deutsche Bank AG engages in U.S. banking activities directly through its New York branch, based in this District.  Defendant Deutsche Bank Securities Inc. is a wholly owned subsidiary of Deutsche Bank AG.  It is incorporated in Delaware with its principal place of business in New York, New York.  At all times during the Class Period, Deutsche Bank AG and Deutsche Bank Securities Inc. (collectively, "Deutsche Bank") employed traders in New York who facilitated and executed FFB transactions with the Class.  Deutsche Bank directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker.  Deutsche Bank purposefully engaged in FFB transactions with Class members at artificial prices.

29.    **First Tennessee:** Defendant First Tennessee Bank, N.A. is a financial services company based in Memphis, Tennessee.  Defendant FTN Financial Securities Corp. is a wholly owned subsidiary of First Tennessee Bank, N.A.  These two entities operate as a single unit, advertising their operations using the same trade name and on First Tennessee Bank, N.A.'s website.  Their holding company, First Horizon, consolidates revenues generated by First Tennessee Bank, N.A. and FTN Financial Securities Corp. in its financial reports.  At all times during the Class Period, First Tennessee Bank, N.A. and FTN Financial Securities Corp.

(collectively, "First Tennessee") employed traders in New York who facilitated and executed FFB transactions with the Class. First Tennessee directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker. First Tennessee purposefully engaged in FFB transactions with Class members at artificial prices, including the City of Baltimore.

30.    **Goldman Sachs:** Defendant Goldman Sachs & Co. LLC is incorporated in New York with its principal place of business in New York, New York. It is a subsidiary of the Goldman Sachs Group, Inc. At all times during the Class Period, Goldman Sachs & Co. LLC employed traders in New York who facilitated and executed FFB transactions with the Class. Goldman Sachs & Co. LLC directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker. Goldman Sachs & Co. LLC purposefully engaged in FFB transactions with Class members at artificial prices.

31.    **Jefferies Group LLC:** Defendant Jefferies Group LLC is the largest independent full-service global investment banking firm headquartered in the U.S, with its headquarters in New York, New York. Previously, Jefferies Group LLC was named Jefferies & Co and was a wholly owned subsidiary of Jefferies Group, Inc.. However, Jefferies Group Inc. merged with Leucadia National Corporation on March 1, 2013, and Jefferies Group Inc. was subsequently renamed Jefferies Group LLC as a subsidiary. Leucadia National Corporation was eventually renamed as Jefferies Financial Group LLC in 2018, and Defendant Jefferies Group LLC is now the largest subsidiary of Jeffries Financial Group Inc., which is incorporated in New York. At all times during the Class Period, while operating as Jefferies & Co., Jefferies Group LLC employed traders in New York who facilitated and executed FFB transactions with the Class. Jefferies

Group LLC directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker. Jefferies Group LLC purposefully engaged in FFB transactions with Class members at artificial prices, including the City of Baltimore.

32.    **JPMorgan:** Defendant JP Morgan Chase Bank, N.A. is a wholly owned "principal" subsidiary of JPMorgan Chase & Co., headquartered in New York, New York. Defendant J.P. Morgan Securities LLC, which acquired J.P Morgan Clearing Corp. in 2016, is also a wholly owned and "principal" subsidiary of JPMorgan Chase & Co. It is incorporated in Delaware with its principal place of business in New York. At all times during the Class Period, JP Morgan Chase Bank, N.A. and J.P. Morgan Securities LLC ("JPMorgan") employed traders in New York who facilitated and executed FFB transactions with the Class. JPMorgan directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker. JPMorgan purposefully engaged in FFB transactions with Class members at artificial prices.

33.    **UBS:** Defendant UBS Securities LLC is an indirect, wholly owned subsidiary of UBS AG, which is a Swiss company based in Basel and Zurich, Switzerland. Its principal place of business is in New York, New York. At all times during the Class Period, UBS Securities LLC employed traders in New York who facilitated and executed FFB transactions with the Class. UBS Securities LLC directed its FFB transactions to the United States, and in particular New York, and engaged in these transactions, including by serving as a trading broker. UBS Securities LLC purposefully engaged in FFB transactions with Class members at artificial prices, including the City of Baltimore.

C.    **Unnamed Co-Conspirators**

34.    Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct alleged herein.

## FACTUAL ALLEGATIONS

I.    **BACKGROUND**

A.    **Fannie Mae and Freddie Mac Bonds ("FFBs")**

35.    Fannie Mae and Freddie Mac are "government-sponsored enterprises" that play a significant role in the mortgage industry.  They were initially created by Congress to stabilize the U.S. residential mortgage market and expand opportunities for affordable housing and homeownership.  Accordingly, to make consumer mortgage loans more affordable, Fannie Mae and Freddie Mac guarantee and purchase loans from mortgage lenders, such as banks, that in turn provide mortgage loans to consumers.  In other words, Fannie Mae and Freddie Mac provide liquidity to mortgage lenders, who can then issue loans to consumers at lower rates.

36.    Fannie Mae and Freddie Mac obtain the funds to finance their mortgage purchases and other business activities by selling debt securities such as FFBs.  FFB issuances occur at least monthly, often on dates set forth in a calendar published by Fannie Mae and Freddie Mac. Newly issued FFBs are very similar, if not identical, to existing FFBs, except that they mature on a later date.

37.    Each FFB receives a distinct nine-digit, alphanumeric identifying number called a Committee on Uniform Security Identification Procedures ("CUSIP") number.  This number provides identifying information about the FFB, including the bond issuer, type of security, and bond maturity.

38.     All FFBs bear common characteristics and are considered part of a single class of issuances.

39.     All FFBs are unsecured debt securities issued by Fannie Mae and Freddie Mac, and are not backed by the full faith and credit of the U.S. government.  In other words, FFBs are not guaranteed by the federal government.  However, the risk that Fannie Mae or Freddie Mac defaults on its repayment obligations—also known as its "credit risk"—is still relatively low, because Fannie Mae and Freddie Mac are "government sponsored enterprises" established by Congress and therefore regarded as closely related to the U.S. government.  In the wake of the financial crisis in 2008, a government agency, the Federal Housing Finance Agency, became the conservator of Fannie Mae and Freddie Mac.  Therefore, the subordinated debt of these institutions, like most "government sponsored enterprises," receives a high credit rating.

40.     FFBs are exempt from the federal securities laws, because they are unregulated, unregistered OTC issuances.

41.     Each Defendant employs a trading team that conducts all of its FFB trading.  The employees on this team set the prices that Defendants charge investors for all types of FFBs in the secondary market.

42.      FFBs all have certain characteristics, including face value, maturity, and coupon payment, which determine the annual return earned on the FFB, or its "yield to maturity."

43.     The "face value" of an FFB means the amount owed to its holder by Fannie Mae or Freddie Mac upon maturity of the bond.  "Maturity," in turn, is the set date after the FFB is issued when its principal amount is to be paid in full.  Within FFBs all of a specific maturity, the most recently issued FFBs are called "on-the-run" FFBs, while older FFBs are called "off-the-run" FFBs.

44.     Most FFBs pay a fixed-rate of interest for their entire term, or a fixed coupon rate on a semi-annual basis.  Some FFBs pay rates that are set to adjust based on a specified index, such as a variable or floating coupon rate.   Fixed-rate FFBs have fixed maturities that guarantee their principal amounts at maturity.  However, the market value of these FFBs will change with interest rates: if interest rates rise, prices will fall and FFBs will lose value if sold prior to maturity; but, if interest rates fall, FFB values will increase, allowing for capital gains.

45.     FFBs with longer maturities—meaning maturities between 2 and 10 years (medium-term FFBs) and longer than 10 years (long-term FFBs)—also sometimes offer "coupon" payments.  Coupon payments are semi-annual interest payments which are based on a set percentage of the FFB's face value.  For example, an FFB with a face value of $1,000 with a 5% coupon rate will pay a $25 coupon semi-annually, each year until maturity. Once the FFB reaches maturity, Fannie Mae or Freddie Mac then pays the holder the face value of the FFB.

46.     FFBs with shorter securities—meaning those under 2 years—do not offer coupon payments, but instead are issued below face value.  These FFBs permit the FFB purchaser to earn, and Fannie Mae and Freddie Mac to pay, interest based on the difference between the lower price paid for the FFB and the higher value due upon maturity.  For example, if a purchaser pays $950 for a short-term FFB with a face value of $1,000 that matures in 1 year, that purchaser will receive 5% interest—or, $50 more than it paid for the FFB—which is the amount Fannie Mae or Freddie Mac paid to borrow $1,000 for 1 year.

47.     Most FFBs cannot be redeemed early by Fannie Mae or Freddie Mac, the issuers. However, Fannie Mae and Freddie Mac also issue some FFBs that can be redeemed by them prior to maturity.

B.    **FFB Transactions**

48.    Fannie Mae and Freddie Mac issue FFBs by selling them to a select group of securities dealers, referred to as "Approved Dealers." The Approved Dealers then trade the FFBs they acquire from Fannie Mae and Freddie Mac with investors, such as the City of Baltimore and the Class, typically in the Secondary Market.

49.    Accordingly, the FFB market has a three-tier structure: Fannie Mae and Freddie Mac sit at the first tier, issuing FFBs; Approved Dealers, like Defendants, are at the second tier, purchasing FFBs at issuance and trading them with investors, like the City of Baltimore, and other non-Defendant dealer banks; and investors, also like the City of Baltimore, are at the bottom tier, selling and buying FFBs from Approved Dealers.

50.    Fannie Mae and Freddie Mac issue FFBs in two ways. Collectively, these two ways of issuing FFBs are referred to throughout this Complaint as the "Issuance Process."

51.    First, Fannie Mae and Freddie Mac issue most medium and long-term FFBs through "syndication." A syndication occurs when a group of Approved Dealers (the "syndicate") underwrites the FFB issuance, meaning that they agree to purchase the FFBs issued by Fannie Mae or Freddie Mac.

52.    Second, Fannie Mae and Freddie Mac issue FFBs through private auctions, in which only Approved Dealers can purchase FFBs.

53.    Accordingly, the Issuance Process gives Defendants, the largest Approved Dealers, control over the supply of newly-issued FFBs. These Approved Dealers then profit from this control by selling their newly-acquired FFB inventory to investors.

54.    Typically, investors like the City of Baltimore do not participate in the Issuance Process, but instead trade FFBs with Approved Dealers.

55.    When Approved Dealers first sell their newly-acquired FFBs on the day they were issued, these sales are considered to occur in the primary market.  After a syndicate is terminated, any subsequent FFB sales are considered to occur in the secondary market. Additionally, when investors sell older issued FFBs rather than hold them until maturity, or purchase such older issued FFBs from dealers, these transactions are considered to occur in the secondary market.

56.    The above-referenced DOJ investigation involves a conspiracy by dealers to fix prices of FFBs they traded with investors in the secondary market.

**C.    Defendants' Control of the Supply of FFBs**

57.    As explained above, Approved Dealers acquire a substantial portion of issued FFBs by underwriting them during a syndication.  The Approved Dealers in turn use these newly-acquired FFBs to transact with investors like the City of Baltimore. Therefore, an Approved Dealer's share of FFB underwriting during a syndication corresponds to the amount of its FFB inventory available to trade with investors in the secondary market.

58.    Table 1 below depicts the amount of FFBs, with maturities less than or equal to 1 year and maturities of 2 and 3 years, underwritten by various entities during the Class Period, based on available data. As shown in the Table, Defendants together underwrote approximately $509 billion of FFBs during the Class Period, comprising approximately 74% of total FFB issuance.

59.    Defendants were some of the largest FFB underwriters in the United States, with all Defendants but two in the top twenty-five underwriters and at least seven Defendants in the top ten underwriters.

60.    Accordingly, Defendants together controlled FFB supply and were capable of using that control to fix FFB prices in the secondary market, including in transactions with the City of Baltimore and the Class.

**TABLE 1**
**Share of FFB Underwriting During Class Period**

| Underwriter | Amount Underwritten | % of Total in Class Period |
|---|---|---|
| Barclays Capital | $113,394,008,290 | 16.45% |
| UBS Securities | $82,666,333,320 | 11.99% |
| Goldman Sachs | $55,327,566,630 | 8.03% |
| JP Morgan Securities | $53,904,082,620 | 7.82% |
| Citigroup Global Markets Inc | $51,880,833,300 | 7.53% |
| Deutsche Bank Securities Inc | $50,241,845,330 | 7.29% |
| Bank of America | $26,128,166,630 | 3.79% |
| Credit Suisse | $19,527,785,000 | 2.83% |
| Jefferies & Co | $14,356,400,000 | 2.08% |
| BNP Paribas Securities Corp | $14,308,500,000 | 2.08% |
| Credit Suisse Securities USA | $13,439,166,660 | 1.95% |
| Merrill Lynch & Co | $5,475,833,330 | 0.79% |
| FTN Financial | $4,041,002,000 | 0.59% |
| JP Morgan Chase Bank NA | $3,250,000,000 | 0.47% |
| First Tennessee Bank NA | $953,000,000 | 0.14% |
| Deutsche Bank AG London | $250,000,000 | 0.04% |
| **Total underwritten by Defendants** | **$509,144,523,110** | **73.86%** |
| **Total underwritten** | **$689,295,201,660** | |

61.    The Federal Reserve Bank of New York recently published a report supporting the contention that FFB supply is controlled by the biggest FFB dealers.  This report evaluates the percentage of market share owned by the top 10 dealers of "agency debt securities," which include FFBs.  The report concluded that these top 10 dealers engaged in 98.90% of all reported non-coupon agency debt security transactions, which include short-term FFBs, and 81.35% of all reported coupon agency debt security transactions, which include medium and long-term FFBs.

62.    Accordingly, this report demonstrates that the primary FFB market is highly concentrated amongst Defendants, the largest FFB dealers.  This concentration in turn gave Defendants great control over the available FFB supply and pricing in the secondary market as well as the motive and opportunity to fix prices in order to obtain excessive profits on secondary FFB transactions.

**D.    Pricing of FFBs**

63.    FFB prices are inversely related to market interest rates.  When interest rates increase, existing FFB prices decrease, because investors would have to sell their existing FFBs at a discount in order to generate the same interest rate now available to a new buyer.  And, when interest rates decrease, existing FFB prices increase, because investors are less likely to purchase newly issued FFBs with lower interest rates instead of older FFBs promising to pay an above-market interest rates.

64.    Because FFBs are OTC securities, their prices are not made publically available. Rather, FFB traders employed by an Approved Dealer determine the FFP price quotes offered to investors, which are delivered one-on-one, typically through phone or message.

65.    Consequently, the FFB market is not transparent to investors.  Investors cannot quickly compare price quotes received from multiple Approved Dealers because they do not possess real-time information.

66.    Defendants, the largest Approved Dealers, can exploit this opaque market for profit by selling FFBs to investors in the primary and secondary markets at a lower price than the Approved Dealers paid to purchase the FFBs.

67.    FFB price quotes are typically provided as a "bid-ask spread."  The "bid" is the price the dealer is willing to pay to purchase an FFB, and the "ask" is the price at which the dealer is willing to sell that same FFB.  If the bid price is lower or the ask price is higher than

Defendants paid to purchase the FFB, Defendants earn a profit. The greater the bid-ask spread, the higher profit that Defendants earn, and the higher cost that customers like the City of Baltimore pay.

68.    For example, if a Defendant quoted a bid-ask spread of $999.60/$1000.10 for an FFB, the bid-ask spread would be $.50. Defendant is willing to purchase the FFB from the investor at $999.60 (the bid price), and Defendant is willing to sell the FFB to the investor at $1000.10 (the ask price).

69.    Bid-ask spreads in competitive OTC bond markets are kept to a relatively confined range, because dealers must compete with one another for customers. If a dealer quotes prices to customers that are inferior to the prices offered by its competitors, that dealer should lose business.

## II.    DEFENDANTS' CONSPIRACY TO FIX FFB PRICES

### A.    The DOJ Criminal Price-Fixing Investigation

70.    On June 1, 2018, Bloomberg reported that four confidential sources had disclosed that the DOJ had opened a criminal investigation into whether traders manipulated prices in the $550 billion market for unsecured bonds issued by Fannie Mae and Freddie Mac.

71.    The inquiry reportedly focuses on whether traders at banks coordinated with one another in order to benefit the banks that they worked for, by fixing prices offered to investors in the secondary FFB market, such as the City of Baltimore. Investigators are looking at potential fraud and antitrust violations.

### B.    The Structure of the FFB Market Permitted Defendants to Collude

72.    Defendants had means to coordinate their price quotes through secret channels of communication such as electronic chat rooms. The ability to communicate in real-time permitted traders to discuss particular customers and to ensure they were offering the same prices.

Publications such as the *Wall Street Journal* and *MarketWatch* have noted that "chat rooms have become integral to the way traders communicate with one another and clients," including with respect to "possible manipulation of . . . markets." For example, electronic chats were utilized in perpetrating the LIBOR scandal.

73.    Defendants also possessed a motive to collude in fixing secondary market FFB prices. Fannie Mae and Freddie Mac determined which Approved Dealers received underwriting privileges based upon their performance in the secondary market, thereby giving Defendants an incentive to increase profits in the secondary market.

74.    The fact that the FFB market is an OTC market further facilitated Defendants' price-fixing conspiracy.

75.    First, as described above, an OTC market lacks transparency in pricing. Because dealers provide price quotes on a one-on-one, non-public basis, investors like the City of Baltimore and the Class cannot check prices in real-time to determine if better prices exist in the market. Accordingly, Defendants were able to successfully fix prices without risk that their investors would discover their conspiracy.

76.    Second, and relatedly, investors interact with only a finite number of dealers, before conducting a secondary FFB transaction. As a result, investors lack the information necessary to uncover a wide-reaching price-fixing conspiracy, and Defendants can easily coordinate prices amongst only a few dealers.

77.    Third, OTC transactions are time-consuming and often complex, thereby giving dealers time to coordinate their pricing quotes before an FFB transaction is completed.

78.    The Treasury Market Practices Group ("TMPG"), which describes itself as a group of "senior business managers and legal professionals from a variety of institutions . . .

sponsored by the Federal Reserve Bank of New York" whose mission is "supporting the integrity and efficiency of the Treasury, agency debt, and agency mortgage-backed securities markets," has issued best practices recommendations for the FFB market which recognize the market's potential for collusion and price manipulation.[4]

79.     Since 2010, TMPG has published best practice recommendations relating to the FFB market.  In its most recent recommendations, issued in January 2018, TMPG warned against "illegal activities such as price manipulation" in the introduction.  In discussing market integrity and transparency, TMPG noted the potential for manipulative trading strategies that falsely convey or affect market price,  such as improperly using confidential information or "painting the tape" by creating an inaccurate appearance of trading activity.

80.     The misuse of confidential information is particularly harmful to competition in OTC markets like the FFB market.  FFB investors must disclose confidential information, including their identity and details regarding the transaction they want to enter into, to a dealer rather than trade on a public exchange.  TMPG explicitly acknowledges the potential for market manipulation when traders share such confidential information with competing traders, and states that misappropriation of confidential information, along with illegal communications amongst competing traders, permitted dealers to perpetrate the anti-competitive conspiracies to manipulate Forex prices and LIBOR.  The FFB market is similarly structured to permit this sharing of confidential information, and resulting price fixing, amongst dealers, permitting an inference of an unlawful agreement amongst Defendants to unreasonably restrain competition in the secondary market.

---

[4] These best practices recommendations are entitled "Best Practices for Treasury, Agency Debt, and Agency Mortgage-Backed Securities Markets," which encompass the FFB market as a market for "agency debt" securities.

81.    As TMPG acknowledges, the FFB market is also structured to permit "painting the tape" by dealers.  As discussed above, this practice is a form of market manipulation whereby dealers attempt to influence the price of a security by trading it amongst themselves to create the appearance of substantial trading activity.  In doing so, dealers can create an artificial price for an FFB, because high trading volumes often attract the attention of investors.  The dealers can then sell the FFB at this inflated price and earn a profit compared to the lower price they paid to initially purchase the FFB.

82.    All dealers who are member firms of the Financial Industry Regulatory Authority, Inc. ("FINRA") are required to report eligible OTC secondary market bond transactions to the Trade Reporting and Compliance Engine ("TRACE").  Therefore, by looking at TRACE data, Defendants could easily confirm that the other members of the conspiracy were abiding by the agreement to fix prices in their secondary FFB transactions.

83.    The nature of employment in the FFB market is also conducive to collusion.  The individuals working in this field comprise a small group of traders and salespersons who repeatedly work with or interact with each other in the same market.  Consequently, many of the FFB traders employed by each of the Defendants had established relationships, and sometimes even prior employment, with traders employed by the other Defendants.  For example, on May 17, 2010, Deutsche Bank Securities announced that it had hired several individuals employed by other Defendants to join its FFB sales and trading team: Jared Dolce from Citigroup Inc., Nick Blewitt from UBS Securities, and John Raveche from Barclays Capital.  Raveche then joined UBS later during the Class Period, serving as an Executive Director for bonds sales.  Similarly, in 2009, UBS Securities hired Anatoly Nakum from Defendant Barclays Capital Inc. (who had previously also worked as a trader at Defendant Deutsche Bank AG) to work as a credit trader.

84.    As discussed above, the primary FFB market is highly concentrated amongst Defendants, a limited number of competitors, due to their underwriting during the Issuance Process.  Defendants in turn control the supply of FFBs available to investors in the secondary market and, accordingly, can easily manipulate the prices of FFBs in that market.

85.    Furthermore, multiple barriers to entry preclude others, such as smaller banks, from entering the FFB market and challenging Defendants.  It is both expensive and risky to become an Approved Dealer, because banks must be willing and capable of holding and trading a significant inventory of FFBs subject to market changes, including fluctuations in interest rates. The Bank for International Settlements, a research organization owned by 60 central banks from around the world, described some of these barriers to entry as including:  "a sufficiently large client base to ensure access to sizeable order flow information; the balance sheet capacity to take on large principal positions; continuous access to multiple markets, including those for funding and hedging instruments; the capacity to manage inventory and other risks; and market expertise to provide competitive quotes, including during times of elevated financial market volatility." These barriers to entry prevented competitors from entering the FFB secondary market on equal footing such that they could compete with Defendants by offering better price quotations.

## C.    Economic Data Confirms the Defendants' Conspiracy

86.    The publically available economic data for FFB prices during the Class Period strongly suggests that Defendants operated a price-fixing conspiracy in the FFB market which inflated the prices of FFBs purchased by investors, both at issuance and in the secondary market, and deflated the prices of FFBs sold by investors in the secondary market.

87.    The City of Baltimore conducted an economic analysis of FFP pricing during the Class Period.  This analysis revealed statistically significant anomalies in FFB prices during the

class period that are not reflective of a competitive market.[5]  Specifically, the economic data shows indicates that: (1) the issuance prices of newly-issued FFBs were artificially high at issuance relative to the price at which Defendants purchased the FFBs during the Issuance Process; (2) the prices of on-the-run FFBs were artificially high in the time period before a new FFB issuance; and (3) the bid-ask spreads were artificially wide during the Class Period.  This data suggests that the FFB market was not competitive during the Class Period, which is consistent with the concerns of the DOJ's antitrust investigation.

88.    However, this anti-competitive pricing ceased after April 2014, when the investigations into the Forex and LIBOR scandals regarding other price fixing conspiracies, beginning as early as 2012, came to a head.  Specifically, during that month, multiple news outlets reported that DOJ prosecutors were going to question Forex traders, and that criminal prosecutions would extend beyond the LIBOR scandal. Eventually, these various investigations uncovered numerous deficiencies in Defendants' compliance and oversight procedures in their trading and sales divisions during the Class Period.  As a result of these investigations and the subsequent fines and prosecutions, Defendants implemented new compliance and oversight measures.  Noticeably, FFB prices around this time drastically changed.

### 1.    Price Fixing of Newly-Issued FFBs

89.    The City of Baltimore evaluated the prices that Defendants charged investors for newly-issued FFBs at issuance.  The data shows that the prices for newly-issued FFBs were inflated, causing investors like the City of Baltimore and the Class to overpay for these FFBs.

90.    As underwriters, Defendants pay a price to Fannie Mae and Freddie Mac to obtain the FFBs (the "underwriter price").  Defendants in turn sell these FFBs to investors at the time of

---

[5] Statistical significance here means that these results are at least 95% likely to be caused by market factors rather than pure chance or randomness.

issuance, for a different, typically higher price (the "issue price"). The difference between the issue price and the underwriter price represents a form of compensation to the underwriter for providing a service (the "dealer discount").

91. In a competitive market, an investor can go to a different underwriter and ask for a price quote for an issuance if the first quote the investor receives is too high. However, in an anti-competitive market in which dealers are colluding to artificially inflate the issue prices, all colluding dealers will be more likely to provide the same, marked-up price quotes. Accordingly, if Defendants conspired to fix issue prices of new FFBs, the data should exhibit higher dealer discounts, and therefore issue prices, during the Class Period as compared to those prices after the Class Period.

92. Data that is publicly available supports the inference that Defendants were colluding to increase dealer discounts, and thus issue prices, for newly-issued FFBs. As shown below in Figure 1, the average dealer discount for this data set was approximately 2 basis points higher (a 25% difference) during the Class Period than after the Class Period.

**FIGURE 1**
**Dealer discount charged above issue price for newly-issued FFBs**



25

93.     For example, the City of Baltimore compared the dealer discounts for FFBs with maturities of 1 year.  As shown below in Figure 2, the data indicates a similar pattern to that in Figure 1: the dealer discounts are higher on average during the Class Period than after the Class Period.  This is consistent with collusion by Defendants to increase dealer discounts, and thereby issue prices, in the FFB primary market.

**FIGURE 2**
**Dealer discount charged above issue price for newly-issued 1-year FFBs**



2.     **Price Fixing of "On-The-Run" FFBs Before They Went "Off-The-Run"**

94.     The City of Baltimore also evaluated the prices that Defendants charged for on-the-run FFBs in the period leading up to a new FFB issuance, when they would become off-the-run FFBs.

95.     FFB issuances usually occur on a predictable, set schedule, as explained in Part I. Newly-issued FFBs are priced similarly to previously issued FFBs of the same type.  The only difference between newly-issued and previously-issued FFBs of the same type is the maturity date, which is later for a newly-issued FFB.

96.     Accordingly, Defendants could exploit this pricing relationship by inflating the value of existing FFBs that were about to go "off-the-run," which in turn would inflate the price they could charge investors for newly-issued FFBs of the same type.

97.     After the government investigations came to a head at the end of April 2014, prices for FFBs that were about to go "off-the-run"—for example, the 5 days before a new issuance of the same type—were lower than prices for newly-issued FFBs of the same type.

98.     This price difference makes economic sense, because demand is higher for on-the-run FFBs than for off-the run FFBs, driving up the price for on-the-run FFBs.  Demand is higher for on-the-run FFBs because they are more liquid than off-the run FFBs, and therefore easier to sell at market price.  Accordingly, demand and price of FFBs about to go off-the-run in a competitive market should be lower in the five days before an issuance of new FFBs of the same type than the demand and price for the newly issued FFBs in the 5 days following a new issuance, because investors would rather purchase the newly-issued FFBs.

99.     However, before April 27, 2014, this did not happen, which supports the inference that the secondary FFB market was not competitive.  The City of Baltimore's evaluation of the relevant data revealed a statistically significant increase in the price of FFBs that were about to go off-the-run in the five days preceding the issuance of new FFBs of the same type.[6]

100.    Figure 5 below shows the difference between the average price of all FFBs in a five-day period leading up to a new issuance and the average price of all FFBs in a five-day period following a new issuance.  In the period after April 27, 2014, the data is consistent with a competitive market: the average price of FFBs in the five days leading up to a new issuance was lower, due to low demand, than the average price of FFBs in the five days following a new

---

[6] The City of Baltimore removed data on and after June 1, 2017 due to abnormal patters in the closing price observed during that period.

issuance (the blue bar). However, this relationship does not hold during the Class Period: the average price of FFBs in a five-day period leading up to a new issuance was actually *higher* than the average price of FFBs in a five-day period following a new issuance (the red bar). These results are consistent with collusive conduct by Defendants to manipulate FFB prices.

**FIGURE 3**
**Price change from five days before new issuance to five days after (all FFBs)**



101.    As a robustness test, the City of Baltimore performed the same analysis, separately, for FFBs with maturities of two and three years, respectively. These results are consistent with artificial inflation in FFB prices in the days leading up to a new issuance during the Class Period.

102.    First, Figure 4 shows that for FFBs with a maturity of two years during the Class Period, the average price of FFBs in a five-day period leading up to a new issuance was almost identical to the average price of FFBs in a five-day period following a new issuance. By contrast, after the Class Period, the average price of FFBs in a five-day period leading up to a

new issuance was about 7 basis points lower than the average price of FFBs in a five-day period following a new issuance.

**FIGURE 4**
**Price change from five days before new issuance to five days after (FFBs with 2 year maturity)**



103.    Second, Figure 5 shows that for FFBs with a maturity of three years during the Class Period, the average price of FFBs in a five-day period leading up to a new issuance was almost 4 basis points higher than the average price of FFBs in a five-day period following a new issuance.   By contrast, after the Class Period, the average price of FFBs in a five-day period leading up to a new issuance was about 11 basis points lower than the average price of FBs in a five-day period following a new issuance.

**FIGURE 5**
**Price change from five days before new issuance to five days after (FFBs with 3 year maturity)**



### 3.    Price Fixing of Bid-Ask Spreads

104.    The City of Baltimore also examined the bid-ask spreads offered to investors in the secondary FFB market during the Class Period and after April 27, 2014.[7]  The results were statistically significant: bid-ask spreads were wider during the Class Period than in the post-class Period.

105.    As explained above in Part I, bid-ask spreads generally narrow in a competitive market, because dealers offering wider spreads (on either or both sides of the spread) will lose customers to competitors who charge narrower spreads.

106.    For example, FFB Dealer A quotes a bid-ask spread of $999.60/$1000.10 for an FFB.  The bid-ask spread would be $.50.  FFB Dealer A is willing to purchase the FFB from the investor at $999.60 (the bid price), and FFB Dealer A is willing to sell the FFB to the investor at

---

[7] To ensure that the results were not skewed by outliers in the data, Plaintiff removed the highest 5% of bid-ask spreads and the lowest 5% of bid-ask spreads for its sample set.  Plaintiff also removed data from on and after June 1, 2017 due to abnormal patterns observed in that data.

$1000.10 (the ask price).   In a competitive market, competing FFB Dealer B may respond by offering that investor a $999.70/$1000.00 for the same FFB.  This bid-ask spread is narrower, by $.20, and less profitable for FFB Dealer B, because it offers a higher purchase price and a lower selling price than FFB Dealer A offers.   However, offering this bid-ask spread makes FFB Dealer B more likely to secure the customer's business for that FFB.

107.    By contrast, under a conspiracy to fix bid-ask pricing, dealers may agree with one another to artificially alter FFB prices: by deflating the bid price, inflating the ask price, or both, or offering a set bid-ask spread or a minimum bid-ask spread.  Under any of these scenarios, the dealers are in a financially superior position than they would be if they competed.  They do not risk losing business to competitors offering narrower bid-ask spreads or better pricing, and they can ensure they receive a profit on every transaction.   In other words, Defendants had a motivation to fix the bid-ask spreads offered to investors in the secondary FFB market during the Class Period: it ensured that they would receive artificially inflated profits at the expense of the City of Baltimore and the Class, who overpaid or were underpaid in these FFB sales.

108.    As shown below in Figure 6, the average bid-ask spread across all FFBs was higher during the Class Period than after the Class Period, consistent with collusion among Defendants to fix prices.

**FIGURE 6**
**Average bid-ask spread for all FFBs**



**D.    Defendants' Deficient Oversight and Supervision of FFB Trading**

109.    As described above in Part I, government investigations have already revealed that Defendants have engaged in anti-competitive price-fixing conspiracies in other financial markets during the Class Period, including the LIBOR and Forex scandals, perpetrated in part as a result of Defendants' deficient oversight and compliance policies.  These investigations resulted in criminal convictions, billions of dollars in fines, and successful civil lawsuits brought by investors.

110.    These facts provide further support for the inference that Defendants committed the price fixing conspiracy in the FFB market alleged here, because they show that Defendants had inadequate compliance and oversight systems in place for their trading and sales divisions during the Class Period.

111.    Forex: In the fall of 2013, news outlets began reporting that the U.S. government officials (and eventually, international authorities) were investigating potential manipulation of

the foreign exchange market.  These suspicions were confirmed by conducting economic analysis of trading patterns and price changes like the analysis employed above for FFBs. Accordingly, Defendants Barclays, Citi, JPMorgan, and UBS pled guilty to criminal conspiracy to manipulate Forex rates, and, recently, Defendant BNP Paribas pled guilty to an antitrust conspiracy to fix prices in the Forex market, in violation of the Sherman Act.  Multiple Defendants here were also fined in millions and billions of dollars by various government institutions, including by: the DOJ (Barclays, Citi, JPMorgan, and UBS); the Commodity Futures Trading Commission (Citi, JPMorgan, and UBS); the Office of the Comptroller of the Currency (Bank of America, Citi, JPMorgan); and the Financial Market Supervisory Authority (UBS). The settlements between these Defendants and the listed government authorities describe how the banks conspired to fix Forex prices: they "used private electronic chat rooms to communicate and plan their attempts to manipulate the Forex benchmark prices," to "coordinate[] their trading with certain FX traders at other banks," to "disclose[] confidential customer order information and trading positions, alter[] trading positions to accommodate the interests of the collective group, and agree[] on trading strategies."  These chatrooms were called names such as "The Cartel" and "The Mafia."

112.  <u>LIBOR</u>:  Multiple government investigations and civil lawsuits have revealed a conspiracy amongst various banks to manipulate the London Interbank Offered Rate ("LIBOR"), a benchmark interest rate at which banks would borrow funds in the interbank market.  Traders employed by various banks and brokers perpetrated this scheme by using electronic communications to collude and submit deliberately false price quotes in order to manipulate the published LIBOR rate.  As a result of these investigations and lawsuits, multiple Defendant banks have been criminally charged and fined by U.S. and international authorities, including

Barclays, UBS, Deutsche Bank, Citigroup, and JPMorgan.    Regulators and prosecutors determined through these investigations that these banks engaged in widespread anticompetitive conduct during the Class Period, including sharing confidential customer and order information and manipulating market prices.

113.    <u>ISDAfix</u>: In 2013, it was reported that several regulators, including the CFTC, the U.K. Financial Conduct Authority, and Germany's BaFin were investigating manipulation of ISDAfix rates.    These rates represent interest-rate benchmarks for market fixed rates for certain interest rate swaps.    Media outlets reported that the CFTC was evaluating emails and instant messages, as well as interviewing bank and dealer employees, in its investigation.    In 2014, it was reported that the CFTC had "found evidence of criminal behavior" and referred this information to prosecutors, resulting in the DOJ and other regulators starting their own investigations.    Subsequently, several of Defendants here reached settlements for their alleged manipulation of ISDAfix: Barclays agreed to pay the CFTC $115 million; Citi agreed to pay the CFTC $250 million; and BNP Paribas, Deutsche Bank, and Wells Fargo agreed to pay hundreds of millions in private settlements.

114.    <u>SSA Bonds</u>: In late 2015, media outlets began reporting that the DOJ was investigating possible collusion in the supranational, sovereign, agency bonds market ("SSA bonds").    The DOJ investigation was confirmed in January 2016 by multiple news stories, including one in the *International Financing Review* which stated that the investigation related to "possible manipulation of bond prices."    Specifically, that report stated that the DOJ was investigating whether "SSA traders at different banks agreed [on] prices and shared information on certain US dollar bonds in chat rooms they established for the purpose."    According to other news stories, the DOJ had obtained transcripts from these online chatrooms.    Meanwhile, shortly

afterwards in January and February 2016, the U.K. Financial Conduct Authority and then the European Commission began separate investigations into potential collusion in the SSA market. In December 2018, the European Commission issued Statements of Objection to four banks relating to their trading of SSA Bonds, including Defendants Deutsche Bank and Bank of America, which indicated that these banks "breached EU antitrust rules" by distorting competition in the SSA bond secondary market, primarily by using online chatrooms to exchange confidential information and to coordinate pricing.  To date, Defendants Bank of America and Deutsche Bank, along with other banks, have agreed to pay almost $100 million to settle antitrust claims that they conspired to fix prices of SSA bonds.

115.    <u>Mexican Government Bonds</u>: In April 2017, the Comisión Federal de Competencia Económica, Mexico's antitrust regulating body, announced that it had discovered evidence of anticompetitive behavior by dealers in the Mexican Government Bond market. These dealers included subsidiaries of Defendants Barclays Bank PLC, Citigroup Inc., JPMorgan Chase & Co., and Bank of America Corp.  At least one bank admitted participation in a conspiracy to fix these bond prices, resulting in its acceptance into a cartel leniency program.

116.    <u>Swiss Franc Interest Rate Derivatives</u>: Defendants UBS AG, JPMorgan Chase & Co., and Credit Suisse AG were fined approximately 32.3 million euros by the European Commission for engaging in a conspiracy to fix bid-ask spreads in the interest rate derivatives market for Swiss francs.  Like the conspiracy in the FFB market alleged here, this conspiracy involved an agreement among traders employed by competitors in the OTC market to charge inflated bid-ask spreads to customers, and it was not detected by Defendants' compliance policies.

### III.    <u>ANTITRUST INJURY</u>

1.    Defendants agreed to fix the prices of FFBs during the Class Period to generate a profit at investors' expense.

2.    The City of Baltimore purchased almost a billion dollars' worth of FFBs during the Class Period.  In particular, they bought 108 FFBs, directly from Defendants Citigroup Inc., UBS Securities LLC, FTN Financial, and Jefferies Group LLC, all priced artificially high due to Defendants' conspiracy.

3.    Specifically, the City of Baltimore was overcharged each time it purchased FFBs from Defendants during the Class Period, and therefore was directly injured in each of these transactions as a result of Defendants' conduct.

4.    The City of Baltimore's FFB transactions include purchase of 108 FFBs, including purchases of FFBs at inflated ask prices Defendant agreed to charge investors during the Class Period (secondary market), and purchases of newly-issued FFBs following FFB issuances (primary market).  As a direct result, the City of Baltimore was injured by overpaying for its FFB purchases from Defendants during the Class Period.

### <u>EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT</u>

1.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their conspiracy from the City of Baltimore and the Class.

2.    Defendants' conspiracy was inherently self-concealing, because its success was dependent on secrecy.  Had Defendants openly fixed prices in the FFB market, the Class would not have continued purchasing and selling FFBs in transactions with Defendants, undermining the very purpose of the conspiracy.

3.    The structure of the FFB market is also inherently secretive.  FFBs are traded in the OTC market, and thus are not based on publically available or real-time pricing information.

Therefore, reasonable due diligence could not have uncovered Defendant's conspiracy behind closed doors to fix FFB prices.

4.      Defendants fraudulently concealed their anticompetitive conduct by, among other things, using secret communications to further the conspiracy. These communications occurred through non-public chat rooms, instant messages, e-mails, telephone calls, and in-person meetings. None of these communications were reasonably available to the City of Baltimore or the Class, nor could they be discovered through exercise of reasonable diligence.

5.      Defendants actively and jointly concealed the conspiracy by, for example, agreeing not to publicly discuss or reveal any acts or communications in furtherance of the conspiracy and by representing that FFB pricing quotes provided to the City of Baltimore and the Class were the product of a competitive market, not fixed by a conspiracy.

6.      The City of Baltimore and members of the Class did not know, nor could they have known, about Defendants' conspiracy until Bloomberg published the article on June 1, 2018 revealing the DOJ investigation into price-fixing in the FFB market.

7.      Accordingly, because of Defendants' fraudulent concealment, any applicable statute of limitations governing the City of Baltimore's or the Class's claims were tolled during the period of concealment, until at least June 2018.

## CLASS ACTION ALLEGATIONS

8.       The City of Baltimore brings this action on behalf of itself and as a class action

under Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of a similarly situated Class

defined as follows:[8]

> All persons or entities who transacted in Fannie Mae or Freddie Mac bonds
> during the period of at least January 1, 2009 through April 27, 2014 (the "Class
> Period") with a Defendant, where such persons or entities were domiciled in the
> United States or its territories. Excluded from the Class are the Defendants and
> any parent, subsidiary, affiliate, employee, agent or co-conspirator of any
> Defendant.[9]

9.       **Numerosity:** Members of the Class are so numerous that joinder is impracticable.

The exact size of the Class is currently unknown, but the City of Baltimore believes that there are

at least thousands of Class members geographically located throughout the United States.

10.       **Typicality:** The City of Baltimore's claims are typical of the claims of the other

Class members.   The City of Baltimore and all Class members were damaged by the same

common course of conduct by Defendants.

11.       **Adequacy of Representation:**  The City of Baltimore will fairly and adequately

protect and represent the interests of the Class.   The City of Baltimore's interests are aligned

with, and not adverse to, those of the Class.   The City of Baltimore is also represented by

competent counsel who are experienced in class action litigation, including antitrust litigation

relating to the manipulation of financial markets.   The City of Baltimore and its counsel possess

the financial resources necessary to successfully litigate this class action.

---

[8] The City of Baltimore reserves the right to amend the definition of the Class, including the
Class Period, in the event that the City of Baltimore obtains additional information.

[9] The Class definition does not include FFB transactions in which a party purchased an FFB
directly from Fannie Mae or Freddie Mac.

12.    **Commonality:** There are questions of law and fact common to the Class, which predominate over any questions solely affecting individual Class members.  These common questions include, but are not limited to:

(a)    whether Defendants and their co-conspirators entered an agreement, combination, or conspiracy to fix or alter FFB prices during the Class Period;

(b)    the duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(c)    whether the alleged conspiracy violated section 1 of the Sherman Act;

(d)    whether the conduct of Defendants and their co-conspirators caused injury to the business and property of the City of Baltimore and the other Class members;

(e)    the appropriate measure of damages sustained by the City of Baltimore and other Class members.

13.    **Superiority:** A class action is superior to other available methods for fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.  The Class is easily definable.  Prosecution as a class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.  Prosecution of separate individual actions by Class members would be costly to the court system, and prosecution of separate individual actions by Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.   By contrast, proceeding as a class action with a cohesive class poses no management issues known to the City of Baltimore, and avoids the costs of individual actions.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, *et. seq.*

14.     The City of Baltimore incorporates by reference the preceding allegations.

15.     Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

16.     During the Class Period, Defendants were horizontal competitors that controlled the supply of, and therefore the prices quoted for, FFBs traded in the secondary market.

17.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained and/or otherwise made artificial prices for FFBs sold and purchased by them in transactions with investors.  Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable restraint of trade and commerce.

18.     Defendants' conspiracy, and the resulting impact on the market for FFBs, occurred in or affected interstate commerce.

19.     As a proximate result of Defendants' unlawful conduct, the City of Baltimore and members of the Class have suffered injury to their business or property, including paying artificial prices for FFBs.  The City of Baltimore and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

### SECOND CLAIM FOR RELIEF
### UNJUST ENRICHMENT

20.     The City of Baltimore incorporates by reference the preceding allegations.

21.     Defendants' conspiracy permitted them to collect supra-competitive profits on all transactions of FFBs with the City of Baltimore and the Class, while causing the City of Baltimore and the Class to pay more for FFB purchases and receive less in FFB sales on all of these transactions.

22.     It would be inequitable for Defendants to be permitted to retain the benefit which Defendants obtained from their manipulative acts at the expense of the City of Baltimore and members of the Class.

23.     The City of Baltimore and members of the Class are entitled to the establishment of a constructive trust over the benefits Defendants received from their unjust enrichment and inequitable conduct.

24.     Alternatively or additionally, each Defendant should pay restitution or its own unjust enrichment to the City of Baltimore and members of the Class.

## RELIEF SOUGHT

Accordingly, the City of Baltimore demands relief as follows:

1.     That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that the City of Baltimore be appointed as class representative, and that the City of Baltimore's counsel be appointed as counsel for the class;

2.     That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

3.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons

41

acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

4.      That the City of Baltimore and the Class recover damages, as provided under federal antitrust laws;

5.      That the City of Baltimore and the Class recover damages or other relief permitted by law or equity for unjust enrichment;

6.      That the City of Baltimore and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

7.      That the Court direct such further relief it may deem just and proper.

## **DEMAND FOR JURY TRIAL**

8.      Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, The City of Baltimore respectfully demands a trial by jury of all issues so triable.

Dated: April 1, 2019                                    Respectfully submitted,

_____

William Christopher Carmody (WC8478)
Arun Subramanian (AS2096)
Seth Ard (SA1817)
Stephanie Spies (5537873)
Susman Godfrey L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-3330
Facsimile: (212) 336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
sard@susmangodfrey.com
sspies@susmangodfrey.com

*Attorneys for The City of Baltimore Mayor
and City Council of Baltimore, itself and on
behalf of all others similarly situated*